IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARMSTRONG TELECOMMUNICATIONS,    CIVIL ACTION – LAW
INC., a corporation,

         Plaintiff,

                                 Case No.

v.

CHR SOLUTIONS, INC., a corporation,

         Defendants.

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Armstrong Telecommunications, Inc., by its undersigned counsel, Cohen & Grigsby P.C., and claims damages against CHR Solutions, Inc., upon the following causes of action:

## I. INTRODUCTION

1.       This is an action arising out of Defendant's material breach of a contract between the parties, as well as for multiple fraudulent and negligent misrepresentations made by Defendants during the course of performance of said contract. Additionally, Defendants engaged in defamatory statements about Plaintiff's business and made statements injurious to services offered by the Plaintiff, all of which have caused Plaintiff to suffer harm.

## II. PARTIES

2.       Plaintiff, Armstrong Telecommunications, Inc. ("Armstrong"), is a Pennsylvania corporation that provides telephone and internet services.

3.       Armstrong's headquarters are located in Butler, Pennsylvania.

4.      Defendant, CHR Solutions, Inc. ("CHR"), is a corporation with its principal place of business at 9700 Bissonnet, Suite 2800, Houston, TX 77036-8014.

## III. JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this contractual dispute pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of costs and interest, and the parties are completely diverse.

6.      The Court has specific personal jurisdiction over Defendant CHR under Pennsylvania's long-arm statute, 42 Pa. C.S. § 5322, because the Defendant has (a) transacted business in this Commonwealth with respect to the specific contract at issue in this dispute by realizing a pecuniary benefit from the contract and engaging in business within this Commonwealth through the execution of the contract and the provision (however insufficient) of the services thereunder; (b) caused harm by an act or omission in this Commonwealth; and (c) caused harm in this Commonwealth by an act or omission outside this Commonwealth.

7.      Defendant, CHR, entered into a contract with Armstrong in Butler, Pennsylvania, and CHR directed and conducted numerous business activities in Butler County, including numerous visits in the course of its performance of its contract with Armstrong described *infra*.

8.      Defendant, CHR, established a long-term relationship with Armstrong in Butler Pennsylvania, and it had numerous contacts with Pennsylvania as a result.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this district and, alternatively, the Defendant is subject to personal jurisdiction in this district with respect to this action.

## IV. FACTS COMMON TO ALL COUNTS

**The ESD Project**

10. Armstrong contracted with the New York State Urban Development Corporation d/b/a Empire State Development ("ESD") in a series of Grant Disbursement Agreements that conferred grants to provide broadband services to rural markets in New York as part of the New NY Broadband Program (hereinafter "ESD Project").

11. The terms of the Grant Disbursement Agreements for the ESD Project require timely construction and implementation of broadband services to designated geographic areas as well as extensive requirements for reporting, compliance, contractor diversity, representations, warranties, and covenants to qualify and continue to receive funding.

12. In its effort to comply with the requirements of the Grant Disbursement Agreements, Armstrong conducted a bidding process where it offered engineering companies, like defendant CHR, the opportunity to bid to provide turnkey outside plant engineering and field services.

13. CHR participated in the bidding process.

14. CHR touts itself on its website as an experienced provider of turnkey Outside Plant Engineering and Field Services ("OSP"):

> In an ever-escalating competitive market, the race to win and keep the customer has never been more important. Our comprehensive, turnkey Outside Plant (OSP) Engineering and Field Services teams deliver the expertise that ensures success, taking your project from inception to completion for every phase of an OSP Project. We can lead you through a step-by-step process, from the initial OSP design, construction implementation management, turn-up, testing and final acceptance on your FTTx projects. With over 100 years of combined industry experience, our OSP engineering team has implemented hundreds of networks across the country.

15. As part of the bidding process, CHR was provided with the requirements of the Grant Disbursement Agreements.

16. As part of the bidding process, CHR presented to Armstrong a certain proposal titled, "Outside Plant Engineering Services Statement of Work Summary Format," which the parties defined in their contract as the "Proposal."

17. CHR also provided Armstrong a binder containing sample contracts, agendas, schedules, designs, splicing diagrams, equipment purchase agreements, and other documents that touted its ability to provide turnkey broadband coverage to designated areas.

18. After receipt of the Proposal and the binder, Armstrong and CHR entered into a certain Master Services Agreement as of May 30, 2017 ("MSA"), which incorporates a Work Order as Appendix A, which in turn incorporates the Proposal to provide details as to the scope of work that CHR agreed to provide to Armstrong. The MSA, with its Appendix A, Work Order, and the Proposal are all attached hereto, and incorporated herein collectively as Exhibit A.

### The Economics of the ESD Project

19. The design of the Grant Disbursement Agreements is to reimburse a significant portion of the cost that it takes to do the fieldwork, design, permitting data, and build out of a broadband network in areas designated by the ESD.

20. Therefore, for a supplier like Armstrong, a fundamental premise of the ESD Project is that, as the project is implemented, Armstrong will secure broadband customers and their monthly payments for broadband, which in the industry are referred to as Monthly Recurring Charges ("MRCs").

21. If a project is not completed correctly and on time, Armstrong loses the benefit of its bargain for MRCs, and once those monthly payments are missed, there is no way to recover past MRCs.

## The Steps of the ESD Project

22. The general steps of an ESD Project are the following:

   i. Fieldwork;

   ii. Design of the network;

   iii. Permitting;

   iv. Construction of the network;

   v. Final acceptance testing; and

   vi. Turning over the network and its data to the broadband provider, in this case Armstrong.

23. The fieldwork consists of sending a technician to physically inspect each utility pole along the intended route, capturing the geographic location data, a photograph, the height of installed wires, distance from adjacent poles, the age, the owner, and the identity of all entities who have wires on the pole. In addition to the utility pole data, fieldwork also encompasses the collection of data on all homes passed within service range of the proposed network, including service poles and geographic location of the point of attachment to the home.

24. Once the initial fieldwork is complete, the next step is to decide upon the architecture of the network through the design process, which is delivered in the form of "staking sheets."

25. Next, permits must be obtained to acquire the authority to attach the broadband, fiber optic cable to each pole along the intended route.

26. Thereafter, CHR pledged to oversee the subcontractors that would build the actual plant and hang the broadband cable.

27. After construction, final acceptance testing to Armstrong's specifications is required.

28. Next, CHR pledged to turn over the completed network and its required data to Armstrong so that the customers could be sold and activated and their MRCs received.

## CHR's Performance of the ESD Project

29. Only upon the successful completion of the prior phases will Armstrong stand to benefit from the MSA through the MRCs it receives from new customers activated as a result of the ESD Project.

30. CHR made critical mistakes in each and every phase of the ESD Project.

31. The initial fieldwork provided by CHR had an error rate that far exceeded industry standards and expectations. Armstrong demands a zero error rate in similar situations when performing such work in-house.

32. CHR's employees missed poles entirely, gathered incorrect and incomplete data about the pole ownership, and had unusable and fabricated "homes passed" data.

33. "Homes passed" is a critical measure for the profitability of the ESD Project because it is the amount of potential customers that could be served by the ESD Project and become Armstrong customers, with Armstrong in turn receiving their MRCs as a benefit of the MSA contract.

34. CHR also made critical mistakes in the design phase of the ESD Project.

6

35. Design drawings, staking sheets, and splice documentation were never subjected to quality control in the field before being released by CHR to subcontractors, resulting in repeated questions, re-design work, delays, and repeated site visits.

36. Stacking sheets designed to instruct subcontractors to install the fiber were not constructible in numbers far above industry standards. Moreover, Armstrong demands a zero error rate in similar situations when performing such work in-house.

37. Armstrong's protocol requires that its broadband networks maintain a 20 km loop length so that each potential customer is within 20 km of a network substation referred to as a hub site.

38. CHR incorrectly designed an initial installation with 30 km loop length, so substantial re-design was required causing significant delays and confusion with real estate and construction subcontractors. Moreover, real estate consultants were sent to scout hub sites at incorrect locations and negotiations were commenced with the incorrect landowners, causing Armstrong to incur double the costs once the designs were corrected and the proper hub site locations were determined.

39. The most egregious result of CHR's repeated errors encountered by Armstrong was the ensuing series of complex pole permitting issues.

40. CHR's late provision of field data and failure to provide missing field data adversely affected the calendar of when and where to apply for pole permits.

41. It took CHR over seven months—until January 2018—to provide the rough route and numbers data, which caused corresponding months of delays in obtaining agreements with the pole owners for permission to use their poles.

42. Despite undertaking to perform permit reconciliation, CHR did not reconcile permits received versus required, which caused severe permitting issues with the pole owners and the New York State Public Service Commission.

43. CHR also made critical errors in the construction of the broadband installation.

44. CHR attached to 548 poles over 20.25 miles without obtaining the required authorizations from the pole owners. Moreover, this construction was never authorized by Armstrong and was outside the geographic area that Armstrong supplied to CHR.

45. Because of this material breach, a stop work order was issued by the pole owner and Armstrong was forced to hire a third party vendor to do an audit and correction.

46. Also as a result of this situation, Armstrong suffered harm to its reputation with the New York State Public Service Commission and the ESD. The Commission requested the ESD issue a formal reprimand of Armstrong.

47. CHR made statements and promises in conference calls with the ESD, the New York State Public Service Commission and numerous other grantees and pole owners, like Armstrong, that CHR would correct errors.

48. Those representations were false when made.

49. CHR knew those representations were false when made.

50. CHR also made statements concerning Armstrong's provision of service on the ESD Project, alleging that Armstrong's actions and inactions caused delays and were deficient and that Armstrong's engineering efforts were problematic.

51. Those statements were false when made.

52. CHR made these statements concerning Armstrong to third parties, including sub-contractors and companies in the industry with which Armstrong transacts business.

53. In addition to resulting delays in activating customers, CHR's deficient performance and misrepresentations caused severe harm to Armstrong's reputation, including harm in relations between Armstrong and pole owners, others in the industry, subcontractors, the ESD, and the New York State Public Service Commission.

54. CHR pledged to provide designs in the LODE Data format as the project was being designed and to upload it to Armstrong's LODE Data system in order to perform quality control, edit design parameters, establish troubleshooting capabilities, and provide house counts, i.e., homes passed data and valid addresses from which to build out the billing system as well as to provide good address information for marketing and direct mailing pieces.

55. Despite this undertaking, CHR did not upload LODE Data until after construction was complete. Even then, CHR uploaded only one-half of the first construction phase representing approximately 10% of the as-built data—despite billing Armstrong as complete—and CHR uploaded no other data for the entire ESD Project.

56. CHR's non-performance caused repeated work stoppages due to a lack of final design drawings for certain territories, and subcontractors negotiated directly with Armstrong so that Armstrong would absorb the costs for warehouse fees and stand down damages.

57. CHR also caused Armstrong to incur damages through its Bill of Material forecasts that were premised upon formulas, not designs, which caused incorrect amounts of materials—both deficient and surplus—to be ordered for the ESD Project, and attendant delay and damages.

58. One apparent reason for CHR's failures was that it never committed resources necessary to perform the project.

59. CHR never invested in a field office, never applied for a license to do professional engineering in New York as an entity, and never mobilized staff or resources commensurate with the scope of the ESD Project.

60. In Phase I of the Grant Disbursement Agreements, Armstrong pledged to complete the installation by December 31, 2018.

61. CHR's breach of the MSA has placed Armstrong's performance of the Grant Disbursement Agreements in substantial jeopardy.

62. If it is required to timely complete its pledged installation schedule, Armstrong will be forced to incur roughly double the construction costs.

63. As a result, instead of expending approximately $14,000 per mile, which is the current rate bid by subcontractors, Armstrong will be forced to hire contractors at roughly double that cost as a result of the requirements that it pay double time for weekends, pay overtime, and otherwise motivate contractors to deploy resources for the ESD Project.

64. Armstrong brought to CHR's attention on numerous occasions CHR's continued inability to satisfy its responsibilities on the ESD Project.

65. CHR pledged to correct the deficiencies, but ultimately CHR was unable to fulfill its responsibilities.

66. Armstrong placed CHR on notice of its intent to terminate CHR and rely upon another vendor in January of 2018, and Armstrong gave CHR one final opportunity to correct things and restore the relationship.

67. Despite the opportunity to cure, CHR was unable or unwilling to cure its vast deficiencies in all phases of its so-called turnkey OSP Engineering and Field Services on the ESD Project.

68. As a consequence of the foregoing, Armstrong was forced to hire Vantage Point to audit, correct, and complete the services that CHR pledged to perform.

69. In connection with the ESD Project, CHR invoiced Armstrong—and Armstrong paid—over $800,000 to CHR, which included payment for tasks that CHR falsely stated were completed and correct, when CHR knew that its assurances and representations were false. CHR also promised deliverables that never were supplied, despite being invoiced by CHR and paid for by Armstrong.

70. Armstrong reasonably relied upon CHR's promises that certain work was completed and correct.

71. Armstrong's reliance was reasonable in that CHR held itself out as experts in the provision of turnkey OSP Engineering Services.

72. As a consequence of CHR's numerous breaches of its agreement, Armstrong's senior management was forced to devote a substantial amount of time and effort to audit, correct and complete work that CHR was supposed to be performing.

73. Armstrong has calculated that it expended $378,447.33 in time by its senior management to correct and complete the work that CHR pledged to perform.

74. Because CHR so substantially delayed the installation and provision of new customers to Armstrong, Armstrong has calculated that, by the time the build project is caught up to where it should be, Armstrong will have lost $6,430,435 in MRCs that it will never recover. This number is based on the assumption that the build project will be caught up by June, 2019. For every month of additional delay, Armstrong will lose an additional $450,000.

75. The MRCs were the basis of the bargain for Armstrong and CHR knew that to be the case.

## COUNT I – BREACH OF CONTRACT

76. The allegations of Paragraphs 1 through 75 of the foregoing Complaint are incorporated herein by reference.

77. Armstrong and CHR entered into a written contract (i.e., the MSA) through which CHR was to provide turnkey outside plant engineering and field services to Armstrong for the ESD Project.

78. Pursuant to the MSA, CHR was to perform services in accordance with professional industry standards of similarly situated businesses providing similar services as required in the MSA. (MSA ¶ 7.a.)

79. CHR was to provide such services in a timely manner, and its promise to do so was a material provision of the agreement. (*Id.* ¶ 10.a.)

80. The MSA requires CHR to complete field work, obtain permits, build the plant, hang the broadband network facilities, conduct final acceptance testing, and turn over the completed network and requisite data to Armstrong.

81. Armstrong fully and timely performed its obligations under the MSA.

82. CHR breached the MSA by providing substandard field work data, failing to obtain permits and reconcile permits as received, providing incorrect design and installation work, and otherwise providing deficient services.

83. CHR missed poles entirely, gathered incorrect and incomplete data about pole ownership, produced unusable and fabricated data, and failed to subject design drawings to quality control.

84. CHR also failed to complete tasks altogether.

12

85. CHR's actions delayed the ESD Project by forcing substantial redesign work, repeated site visits, and confusion with real estate and construction subcontractors.

86. Armstrong suffered damages as a result of CHR's actions.

87. Because of CHR's failure to submit accurate designs, real estate consultants were sent to scout hub sites at incorrect locations and negotiations were commenced with the incorrect landowners, causing Armstrong to incur double the costs once the designs were corrected and the proper hub site locations were determined.

88. Armstrong also suffered complex pole permitting issues, including months of delays in obtaining agreements with pole owners for permission to use their poles.

89. Armstrong was precluded from marketing to potential customers due to the incomplete and inaccurate data provided by CHR related to the number of homes passed.

90. Moreover, CHR attached to 548 poles over 20.25 miles without obtaining the required authorizations from the pole owners, forcing Armstrong to hire a third party vendor to perform an audit and correct the work.

91. The ESD ultimately issued a formal reprimand to Armstrong at the request of the New York State Public Service Commission because of this material breach by CHR.

92. CHR is required to indemnify Armstrong for all damages, liabilities, losses, costs and expenses incurred or suffered by it arising out of or resulting from the services or performance of the services caused by any negligent acts, errors or omissions, breach of the Agreement, or willful misconduct of CHR, its subcontractors, or anyone directly or indirectly employed by them or for whose acts any of them may be liable. (*Id.* ¶ 7.a.)

93. Armstrong is entitled to attorneys' fees incurred in enforcing CHR's indemnification obligations. (*Id.* ¶ 8.)

WHEREFORE, Armstrong Telecommunications, Inc. respectfully requests that judgment be entered in its favor and against CHR Solutions, Inc. for compensatory, consequential, and other damages together with pre-judgment interest, attorneys' fees, costs of this action and such other and further relief that this Court deems appropriate.

## COUNT II – DEFAMATION

94. The allegations of Paragraphs 1 through 93 of the foregoing Complaint are incorporated herein by reference.

95. CHR made false statements concerning Armstrong's performance under the MSA, alleging that Armstrong's actions and inactions caused delays and were deficient and that Armstrong's engineering efforts were problematic.

96. CHR published these statements to third parties, including subcontractors and companies in the industry with which Armstrong transacts business.

97. CHR was neither privileged nor authorized to make these statements.

98. Armstrong suffered harm as a result of CHR's statements.

99. Moreover, these statements constitute defamation *per se* as they tend to injure Armstrong in its trade, business, and profession.

WHEREFORE, Armstrong Telecommunications, Inc. respectfully requests that judgment be entered in its favor and against CHR Solutions, Inc. for compensatory, consequential, and other damages together with pre-judgment interest, costs of this action and such other and further relief that this Court deems appropriate.

## COUNT III – TRADE LIBEL/INJURIOUS FALSEHOOD

100. The allegations of Paragraphs 1 through 99 of the foregoing Complaint are incorporated herein by reference.

101. CHR made statements concerning Armstrong's provision of service on the ESD Project, alleging that Armstrong's actions and inactions caused delays and were deficient and that Armstrong's engineering efforts were problematic, which were false.

102. These statements impugned Armstrong's business services.

103. CHR made these statements to third parties, including sub-contractors and companies in the industry with which Armstrong transacts business.

104. CHR's actions were done maliciously and to deflect attention from CHR's own shortcomings.

105. As a result of CHR's statements about Armstrong's services, Armstrong suffered various economic harms.

WHEREFORE, Armstrong Telecommunications, Inc. respectfully requests that judgment be entered in its favor and against CHR Solutions, Inc. for compensatory, consequential, and other damages together with pre-judgment interest, costs of this action and such other and further relief that this Court deems appropriate.

## COUNT IV – FRAUD

106. The allegations of Paragraphs 1 through 105 of the foregoing Complaint are incorporated herein by reference.

107. CHR made material representations of facts as to whether and how items were completed when it wrongly invoiced Armstrong in connection with the ESD Project for items that it contended were completed and were completed correctly.

108. Specifically, CHR billed Armstrong for the provision of complete LODE Data.

109. However, Armstrong later discovered that CHR uploaded only one-half of the LODE Data from the first construction phrase, representing only 10% of the as-built data.

110. CHR also made statements and promises on calls with the ESD, the New York State Public Service Commission, and other grantees that CHR would correct its errors.

111. These representations were untrue.

112. CHR knew that these representations were untrue.

113. CHR made these representations with the intent to deceive Armstrong in order to induce Armstrong to act upon them.

114. Armstrong relied upon these representations, justifiably in that CHR held itself out as experts in the provision of turnkey OSP Engineering Services.

115. As a result of its reliance upon these untrue statements, Armstrong suffered damages, including harm to its reputation, the expenditure of funds that it otherwise would not have paid and delays in activating customers.

116. Armstrong is entitled to recover all expenditures it incurred in reliance on these representations as well as other damages suffered.

WHEREFORE, Armstrong Telecommunications, Inc. respectfully requests that judgment be entered in its favor and against CHR Solutions, Inc. for compensatory, consequential, and other damages together with pre-judgment interest, costs of this action and such other and further relief that this Court deems appropriate.

## COUNT V – NEGLIGENT MISREPRESENTATION

117. The allegations of Paragraphs 1 through 116 of the foregoing Complaint are incorporated herein by reference.

118. CHR provided information to Armstrong.

119. Specifically, CHR asserted that it had completed correctly certain items of the ESD Project in submitting to Armstrong invoices for payment.

120. CHR also made statements and promises on calls with the ESD, the New York State Public Service Commission, and other grantees that CHR would correct its errors.

121. CHR was aware that the information it provided was to be used for the purpose of obtaining payment from Armstrong and causing Armstrong to believe that the ESD Project was progressing.

122. This information was false and inaccurate.

123. Armstrong and CHR had a contractual relationship, which required CHR to provide this information to Armstrong.

124. CHR did not use due care in providing this information to Armstrong.

125. Armstrong relied on this information justifiably.

126. As a result of its reliance upon these untrue statements, Armstrong suffered damages, including harm to its reputation, the expenditure of funds that it otherwise would not have paid, and delays in activating customers.

WHEREFORE, Armstrong Telecommunications, Inc. respectfully requests that judgment be entered in its favor and against CHR Solutions, Inc. for compensatory, consequential, and other damages together with pre-judgment interest, costs of this action and such other and further relief that this Court deems appropriate.

**JURY TRIAL DEMAND**　　　　　　　　Respectfully submitted,

COHEN & GRIGSBY, P.C.

By: /s/ Kevin C. Harkins

    Kevin C. Harkins
    Pa. ID No. 59915
    Ingrid A. Bohme
    Pa. ID No. 309157
    Cezanne S. Harrer
    Pa. ID No. 324178

625 Liberty Avenue
Pittsburgh, PA 15222-3152
412-297-4900
412-209-0672 (Fax)

*Attorneys for Plaintiff,*
*Armstrong Telecommunications, Inc.*

Dated: June 15, 2018
2793442.v1