**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ARMSTRONG TELECOMMUNICATIONS, INC.,** ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) | **Civil No. 18-787** |
| ) | |
| **CHR SOLUTIONS, INC.** ) ) | |
| **Defendant/Third Party Plaintiff,** ) ) | |
| **v.** ) ) | |
| **VANTAGE POINT SOLUTIONS, INC.** ) **and VIRGINIA GARDEA** ) ) | |
| **Third Party Defendants.** ) | |

## OPINION

In this commercial dispute, Plaintiff Armstrong Telecommunications, Inc. ("Armstrong")

alleges that Defendant CHR Solutions, Inc. ("CHR") breached a contract between the parties.

CHR, in turn, counterclaims that Armstrong breached the contract and alleges that any perceived

problems with CHR's performance of the contract was due to Armstrong's own conduct. In

addition, CHR alleges that its former employee, Third-Party Defendant Virginia Gardea

("Gardea"), unlawfully conspired with Third-Party Defendant Vantage Point Solutions, Inc.

("Vantage Point"), and Armstrong, in a scheme to usurp CHR's contract from Armstrong.

Presently before the Court is the Third-Party Defendants' Motion to Dismiss CHR's Second

Amended Third-Party Claims. ECF No. 92. For the reasons that follow, the Third-Party's

motion to dismiss will be granted in part, and denied in part.

# I.    BACKGROUND

## A.  Procedural History

Armstrong filed a Complaint against CHR on June 15, 2018, alleging various claims arising out of a contract between the parties. ECF No. 1. CHR Answered the Complaint, filed Counterclaims against Armstrong, and filed Third-Party Claims against Gardea and Vantage Point. ECF No. 26. On December 20, 2018, the Court granted the Third-Party Defendants' Motion to Dismiss the Third-Party Claims, without prejudice. ECF No. 65. CHR filed its Amended Third-Party Claims against Ms. Gardea and Vantage Point on January 25, 2019. ECF No. 69. On April 24, 2019, the Court issued a Memorandum Opinion and Order, granting the Third-Party Defendants' Motion to Dismiss CHR's Amended Third-Party Claims, without prejudice. ECF No. 84. On May 24, 2019, CHR filed its Answer to the Complaint, Counterclaims against Armstrong, and Second Amended Third-Party Claims against Gardea and Vantage Point. ECF No. 86. In response, Armstrong answered the Counterclaims, and the Third-Party Defendants filed the instant Motion to Dismiss. ECF Nos. 96 & 92.

## B.  Factual Background

Bearing in mind that the instant Motion to Dismiss does not directly concern the claims and counterclaims between Armstrong and CHR, the relevant factual background necessary for resolution of the present motion is as follows. Armstrong and CHR entered into a Master Services Agreement, dated May 30, 2017 ("MSA"), by which CHR agreed to provide certain specialized engineering services in furtherance of Armstrong's contract to provide broadband services to rural markets in New York. ECF No. 1 at ¶¶ 10-11, 18. Prior to entering into the

MSA, CHR presented Armstrong with a proposal titled, "Outside Plant Engineering Services, Statement of Work, Summary Format (SOW# 2506)," (hereinafter "Statement of Work"). Id. at ¶ 16; ECF No. 5-1, at 13-25; ECF No. 86, at p. 16, ¶ 8. During the negotiations for the MSA, Gardea was employed by CHR, and she was CHR's primary contact person with Armstrong. ECF No. 86, at p. 16, ¶¶ 6-7; p. 19 ¶ 28. She was also the author of the Statement of Work and the MSA. Id. The MSA incorporated the parties' two-page Work Order, which in turn incorporated the Statement of Work. ECF No. 1, at ¶ 18; ECF No. 86, at p. 16, ¶ 8. The MSA, the Work Order, and the Statement of Work, in combination, constitute the parties' contract. Id.; see also MSA, § 22.

### *Armstrong's Allegations against CHR*

Armstrong alleges that, due to CHR's mistakes, deficiencies, and delays in its performance of the Master Services Agreement, in January of 2018, Armstrong placed CHR on notice of its intent to terminate their agreement. ECF No. 1, at ¶¶ 30, 66. Armstrong alleges that CHR failed to cure its deficiencies; and therefore, Armstrong hired Vantage Point to audit, correct, and complete the services that CHR had originally contracted to perform. Id. ¶¶ 67-68.

In response, CHR alleges that Armstrong failed to fulfill its' contractual obligation to consistently provide CHR with "qualified personnel, reliable information, sound engineering, and prompt, reliable decisions." ECF No. 86, at p. 17, ¶¶ 11-12. CHR further alleges that Armstrong failed to timely identify essential hub site locations and transport routes, delayed providing essential design criteria, and changed the design criteria and procedures, while also insisting that CHR substantially revise and redesign the project, without providing sufficient time. Id. at p. 17, ¶¶ 15-17. As a result of the above failures by Armstrong, and Armstrong's

3

additional actions and omissions, the project encountered significant delays. Id. at p. 18-19, ¶¶ 19-25.

### *CHR's Third-Party Allegations*

When Gardea was hired by CHR in August, 2015, she executed a Confidentiality, Non-Disclosure, and Non-Solicitation Agreement ("August 2015 Agreement"). Id. at p. 27, ¶ 27; Confidentiality, Non-Disclosure, and Non-Solicitation Agreement, Aug. 15, 2017, attached to Ex. 4, at ECF No. 86-4, at pp. 2-9. CHR alleges that, while the project with Armstrong was being implemented, Gardea interviewed and accepted employment with Vantage Point, without CHR's knowledge. Id. at p. 19, ¶¶ 25, 29. Vantage Point is a direct competitor of CHR. Id. at p. 19, ¶ 30. Gardea resigned from CHR on September 12, 2017. Id. On the day she resigned, Gardea signed a one-page, four-paragraph, "Employee Confidentiality Agreement ("September 2017 Agreement")", which reiterated her obligations, primarily related to confidential and propriety information, and trade secrets, under the August 2015 Agreement. ECF No. 86, at p. 19, ¶ 31; Employee Confidentiality Agreement, Sept. 12, 2017, attached to Ex. 4, at ECF No. 86-4, at p. 10.

One week after Gardea resigned, CHR's Chief Executive Officer notified Vantage Point of Gardea's confidentiality obligations that prevented both her, and her new employer, "from using or disclosing CHR confidential information and soliciting CHR's clients." ECF No. 86, at p. 20, ¶ 33. Vantage Point's CEO and Gardea allegedly indicated to CHR that they were unaware of any confidentiality agreement. Id. at p. 20, ¶ 34. Therefore, CHR forwarded copies of both the August 2015 and September 2017 documents to Vantage Point's CEO and Gardea. Letter from A. Pasrija to L. Thompson, Sept. 28, 2017, ECF No. 86-4. CHR alleges that Vantage Point's CEO assured CHR that Gardea would not be working on projects in the

Eastern United States, and specifically, that she would not be working on the Armstrong project. ECF No. 86, at p. 20, ¶ 35. CHR relied on these assurances in choosing not to seek formal injunctive relief against Vantage Point and Gardea. Id. CHR further alleges that, contrary to said assurances, "Gardea was actively informed and participated in the solicitation of Armstrong on this very project." Id.

CHR alleges that Armstrong gave decision-making authority to Shawn Beqaj ("Beqaj"), Armstrong's Vice President of Regulatory Affairs, despite the MSA's provision that Kevin Young was Armstrong's designated representative. Id. at p. 17, ¶ 13. According to CHR, during the initial implementation of the project, Gardea developed a friendship with Beqaj. Id. at p. 19, ¶¶ 25, 29. CHR alleges that Beqaj became critical of CHR's work directly after Gardea resigned from CHR. Id. at p. 19, ¶ 25. CHR alleges that within weeks of Gardea's resignation, Armstrong increased its criticism of CHR's work, and also began to have more unexplained urgent "issues". Id. at p. 20, ¶ 32.

On November 13, 2017, Gardea sent an email to Beqaj inviting him to attend a Vantage Point webinar, with the bulk of the email touting Vantage Point's reputation and leadership in performing work related to Armstrong's business. Id. at p. 20, ¶ 36; Email from V. Gardea to S. Beqaj, Nov. 13, 2017, ECF No. 86-5. On December 6, 2017, Vantage Point was actively soliciting Armstrong for work in the Eastern United States, as indicated in emails to Beqaj. ECF No. 86-6, at p. 1. On December 12, 2017, Gardea was included in an email from Vantage Point to Armstrong, which also discussed Vantage Point doing work for Armstrong. Id. Additional email communications from December, 2017 through January, 2018, indicate that

Vantage Point and Armstrong were getting close to finalizing an agreement for work. Id. at pp. 2, 7.

In early February, 2018, Gardea and Beqaj were seen communicating during a Vantage Point sponsored industry event in Springfield, Massachusetts. ECF No. 86, at p. 21, ¶ 38[a][1]. CHR alleges that Gardea's presence at this event in the Eastern United States indicates that Vantage Point never intended to honor its prior assurances that Gardea would only be employed in the Western United States. Id. CHR alleges that, as a result of Gardea's interactions with Beqaj, and in concert with the overall plan to have Vantage Point take over CHR's Armstrong project, Beqaj notified CHR on February 23, 2018, that Armstrong added Vantage Point to audit CHR's work on the project. Id. at p. 21, ¶ 37[b]. On February 26, 2018, Beqaj forwarded to Gardea, an email exchange he had with a CHR Vice President, discussing Armstrong's decision to add Vantage Point to the project. Id. at p. 21, ¶ 38[b]; ECF No. 86-7.

CHR alleges that Armstrong's hiring of Vantage Point to conduct an "audit" was a ruse, with the true goal being to allow Vantage Point to misappropriate CHR's work-product and take over the Armstrong project, all facilitated by Gardea in concert with Beqaj. ECF No. 86, at pp. 22-23, ¶¶ 45, 49. CHR alleges that Vantage Point's audit eventually resulted in the termination of CHR's contract on April 4, 2018, after which Vantage Point took over completion of the Armstrong project. Id. at p. 22, ¶¶ 45-46.

---

1 On page 21 of CHR's Third-Party Claims, there are two paragraphs numbered "37," and two paragraphs numbered "38." The Court distinguishes the paragraphs by adding an "[a]" to the first occurrence of the same paragraph number, and a "[b]" to the second occurrence of the same paragraph number.

*Third-Party Claims*

CHR asserts claims of Breach of Contract (Count I) and Fraudulent Inducement (Count II), solely against Armstrong. Id. at pp. 23-25, ¶¶ 50-59. In Count III, CHR asserts a Breach of Contract claim against Gardea, alleging that Gardea breached her confidentiality agreement by assisting Vantage Point in replacing CHR on the Armstrong contract. Id. at p. 25, ¶¶ 60-64. CHR asserts two separate claims of Tortious Interreference with a Contract: in Count IV, CHR alleges that Gardea and Vantage Point unlawfully interfered with CHR's contract with Armstrong; and in Count V, CHR alleges that Armstrong and Vantage Point unlawfully interfered with CHR and Gardea's confidentiality agreements. Id. at pp. 25-27, ¶¶ 65-76. In Count VI, CHR asserts a claim of Civil Conspiracy against Gardea, Vantage Point, and Armstrong. Id. at pp. 27-28, ¶¶ 77-82. Finally, in Count VII, CHR asserts a claim of Commercial, Trade, or Business Disparagement, based on false claims made by Vantage Point during its' audit of CHR's work. Id. at p. 85, ¶¶ 83-86.

## II. STANDARD OF REVIEW

When reviewing a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Eid v. Thompson, 740 F.3d 118, 122 (3d Cir. 2014) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir.2008)). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

7

inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556); see also Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir.2009) (quoting Graff v. Subbiah Cardiology Associates, Ltd., 2008 WL 2312671 (W.D. Pa. June 4, 2008)); see also Connelly v. Lane Const. Corp., 809 F.3d 780, 790 (3d Cir.2016) ("Although a reviewing court now affirmatively disregards a pleading's legal conclusions, it must still . . . assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them.") (citing Foglia v. Renal Ventures Mgmt., *LLC*, 754 F.3d 153, 154 n. 1 (3d Cir.2014)).

Plaintiff's allegations must be accepted as true and construed in the light most favorable to plaintiff when determining if complaint should be dismissed. Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017), as amended (Aug. 22, 2017). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. Morse v. Lower Merion School District, 132 F.3d 902, 906, n. 8 (3d Cir.1997). The primary question in deciding a motion to dismiss is not whether the Plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. Maio v. Aetna, 221 F.3d 472, 482 (3d Cir.2000). The purpose of a motion to

dismiss is to "streamline [ ] litigation by dispensing with needless discovery and factfinding." Neitzke v. Williams, 490 U.S. 319, 326–327, (1989).

Finally, if the court decides to grant a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the court must next decide whether leave to amend the complaint must be granted. The Court of Appeals has "instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips, 515 F.3d at 236 (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002)).

## III.   DISCUSSION

### A.      Breach of Contract against Gardea, Count III

Gardea moves to dismiss CHR's breach of contract claim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). In the alternative, Gardea moves to dismiss the breach of contract claim for improper venue pursuant to Rule 12(b)(3). Finally, Gardea argues that CHR has no basis for demanding attorney's fees, and that such demand should be stricken.

#### 1.      The Operative Confidentiality Agreement

Although not part of the argument in favor of dismissal of the breach of contract claim, the Third-Party Defendants emphasize that CHR's allegations are not precise as to which of the two Confidentially Agreements Gardea is alleged to have breached. However, it is apparent that the operative agreement is the August 17, 2015 Agreement. The September 12, 2017 Agreement is a one-page, four-paragraph agreement signed only by Gardea on the day she resigned from CHR. It is a reiteration of some of the formal confidentiality obligations agreed to by both

9

parties in the August 17, 2015 Agreement, when Gardea was first hired by CHR. Moreover, the September 12, 2017 Agreement explicitly refers to confidentiality obligation "provisions included in any CHR Solutions' non-disclosure or employment agreements regarding the protection of "Confidential Information" as defined within said agreement(s)." ECF No. 86-4, at 10. CHR provided Gardea and Vantage Point with copies of *both* agreements, when referencing them as a "signed agreement," to remind Vantage Point and Gardea of Gardea's confidentiality obligations. ECF No. 86-4.[2] Therefore, any alleged breach by Gardea will be premised upon the specific terms of the August 17, 2015 Agreement executed by both parties. As such, the operative controlling agreement is the August 17, 2015 Agreement.

### 2.     Improper Venue

This Court does not address whether CHR has properly stated a breach of contract claim, as the Court concludes that said claim should be dismissed for improper venue, pursuant to Federal Rule of Civil Procedure 12(b)(3). As noted, the controlling contract at issue is the August 17, 2015 Agreement. Paragraph 14 of the Agreement provides, in part, that: "Venue for all purposes shall be exclusive in Minnehaha County, South Dakota, and any proceeding by or against any party to this Agreement or with respect to this Agreement, . . . shall be brought in the State District Courts of the State of South Dakota, County of Minnehaha." ECF No. 86-4, at 7, ¶ 14. When a valid forum selection clause designates another court as the exclusive venue for litigation, dismissal of the action under Rule 12(b)(3) is proper.

---

[2] In his letter to Vantage Point's CEO, which was also sent to Gardea, CHR's CEO stated that "Ginny Gardea signed a Confidentiality, Non-Disclosure, and Non-Solicitation Agreement" with CHR, which is the title of the August 17, 2017 Agreement. ECF No. 86-4, at 1. He stated that he had "attached copies of the signed agreement," which were in fact copies of both agreements.

Although CHR did not respond to the Rule 12(b)(3) venue argument raised in the current motion, CHR did argue, in its Sur-Reply Brief filed in response to Gardea's first Motion to Dismiss, that enforcing the venue provision would be "unreasonable under the circumstances." CHR Sur-Reply Br. 2, ECF No. 58.[3] The circumstances here, however, do not qualify as "unreasonable" under applicable case law.  In <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1 (1972), the United States Supreme Court "held that a forum selection clause in a contract between the parties is 'prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.'"  <u>Copperweld Steel Co. v. Demag-Mannesmann-Bohler</u>, 578 F.2d 953, 965 (3d Cir. 1978) (quoting <u>Bremen</u>, 407 U.S. at 10).  Prior to the Supreme Court's decision, the Third Circuit Court of Appeals similarly "held that a court should generally enforce a forum selection clause unless the enforcement would be unreasonable at the time of the litigation."  <u>Copperweld Steel</u>, 578 F.2d at 966 (citing <u>Central Contracting Co. v. Maryland Casualty Co.</u>, 367 F.2d 341, 344 (3d Cir. 1966)).

CHR supports its "unreasonable under the circumstances" argument by explaining that, because the instant litigation arises from the same set of operative facts and involves the same parties, to enforce the venue provision would result in piecemeal litigation, waste judicial resources, and increase the parties' time and expense.  CHR's argument, therefore, is that it would be more convenient to litigate in this Court; rather than, that it would be unreasonable, as a matter of law, to enforce the venue provision.  The relevant case law demonstrates that the "unreasonableness" of enforcing an otherwise valid venue provision is something more than

---

[3] The Court has previously concluded that Gardea's argument, raised in her first Motion to Dismiss, as to the venue provision in the August 17, 2015 Agreement had merit, but did not address CHR's legal argument at that time. Order, Dec. 20, 2018, ECF No. 65.

inconvenience. The Supreme Court explained that it must be shown "that trial in the contractual forum will be so gravely difficult and inconvenient that [the objecting party] will for all practical purposes be deprived of [its] day in court." <u>Bremen</u>, 407 U.S. at 18. "Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." <u>Id.</u> The Third Circuit Court "suggested that the test is whether enforcement 'will put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice.'" <u>Copperweld Steel</u>, 578 F.2d at 966 (quoting <u>Central Contracting</u>, 367 F.2d at 345).

Presently, the Court finds the venue provision to be proper; and as such, "it should be respected as the responsible expression of the intention of the parties." <u>Central Contracting</u>, 367 F.2d at 345. Enforcing the provision will not "put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice." <u>Id.</u> Accordingly, Gardea's Motion to Dismiss Count III's Breach of Contract Claim for improper venue will be granted. Additionally, since venue is not proper in this District, CHR's demand for attorney's fees will be dismissed, as it was premised upon a provision from the August 17, 2015 Agreement.

### B.    Tortious Interference with a Contract, Counts IV & V

"Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are: '(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.'" <u>Crivelli v. Gen. Motors Corp.</u>, 215 F.3d 386, 394 (3d Cir. 2000) (quoting

12

Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)). "Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states that a necessary element of this tort is improper conduct by the alleged tortfeasor . . . ." Crivelli v. Gen. Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000) (citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978); and Restatement (Second) of Torts §§ 766-67). When determining whether the interference is improper the Restatement offers the following factors for the Court to consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767. "The general issue is 'whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.'" Crivelli, 215 F.3d at 395 (quoting Adler, 393 A.2d at 1184 n.17).

### 1. Tortious Interference with a Contract Against Gardea and Vantage Point, Count IV

Applying the standards set forth above, the Court finds that CHR has adequately pleaded an intentional interference with a contract claim under Pennsylvania law, at Count IV, to survive the motion to dismiss at this preliminary stage of the proceedings. CHR alleges that while working on the Armstrong contract, Gardea developed a friendship with Beqaj. She surreptitiously interviewed with Vantage Point after the Armstrong contract was procured, and then accepted employment from Vantage Point before informing CHR. In her new position with

13

Vantage Point, Gardea is alleged to have used information she obtained while working for CHR, and her friendship with Beqaj, to interject Vantage Point between Armstrong and CHR, in order to harm the existing relationship by devising a scheme to take over the Armstrong project.

The alleged scheme involved Gardea and Vantage Point soliciting Armstrong to hire Vantage Point as a ruse to find fault with CHR's work, partly based on Gardea's knowledge of CHR's confidential information, and otherwise. The goal of the scheme was to persuade Armstrong to use Vantage Point's audit of CHR's work as justification to terminate Armstrong's contract with CHR, and thereafter to hire Vantage Point. Gardea and Vantage Point contend that CHR has plead "no facts" to support a tortious interference with a contract. However, the above factual allegations support that CHR has pleaded sufficient facts to plead the elements of their claim against Gardea and Vantage Point. Accordingly, Third-Party Defendants' Motion to Dismiss Count IV, for failure to state a claim upon which relief can be granted, will be denied.

**2. Tortious Interference with a Contract Vantage Point and Armstrong, Count V**

With a similar argument, Vantage Point contends that CHR has plead "no facts" to show that Vantage Point engaged in any conduct to interfere with the confidentiality agreement between Gardea and CHR to support its claim for tortious interference with said contract. CHR has alleged that Vantage Point hired Gardea, in part, because she had confidential CHR information that Vantage Point could use to solicit CHR's client, Armstrong, and that Vantage Point then purposefully caused Gardea to use said confidential information to solicit CHR's former client, Armstrong. CHR also alleges that Gardea purposefully used said confidential information to actually solicit Armstrong. CHR also pleads that both Vantage Point's and Gardea's purposeful action was specifically intended to harm the existing Confidentiality

Agreement between CHR and Gardea. Thus, CHR has sufficiently pleaded a tortious interference with a contract claim against Vantage Point and Armstrong. Accordingly, Vantage Point's and Gardea's Motion to Dismiss Count V, for failure to state a claim upon which relief can be granted, will be denied.

### C. Civil Conspiracy against Gardea, Vantage Point, and Armstrong

The elements of a civil conspiracy claim under Pennsylvania law are: "'(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987–988 (Pa. Super. Ct. 1997)). "Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)

Presently, CHR alleges that Vantage Point and Gardea acted to further their own business interests by entering into a business relationship with Armstrong. See, e.g., ECF No. 86, at p. 21, ¶¶ 37-38, p. 22, ¶ 45-48; p. 23 ¶¶ 49, 54. "Malicious intent requires that a defendant acted 'solely to injure' a plaintiff; injury that is incidental to another purpose, even if it appears 'selfish or unreasonable,' is not malicious." Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co., No. 2:15-CV-00809, 2018 WL 791405, at *6 (W.D. Pa. Feb. 8, 2018) (quoting Thompson Coal Co., 412 A.2d at 472). "A showing that the acts alleged were done to advance the defendant's business interests, such as to increase company profits, precludes a civil conspiracy claim, since this means injuring the plaintiff was not the *sole* purpose of the conspiracy." Id. (citing Bro–Tech Corp. v. Thermax, Inc., 651 F.Supp.2d 378, 419 (E.D. Pa. 2009). Therefore, because the

15

required malice is not sufficiently plead, CHR has failed to state a civil conspiracy claim. Based on CHR's allegations that Vantage Point, Gardea, and Armstrong were acting for a business purpose, and not solely to injure CHR, the Court finds that to permit amendment of this claim would be futile. DePuy Synthes Sales, Inc. v. Globus Med., Inc., 259 F. Supp. 3d 225, 248 (E.D. Pa. 2017) ("a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice"; and citing cases finding no civil conspiracy claim where defendants acted for a business benefit or to reap financial or professional benefits).

Accordingly, Third-Party Defendants' Motion to Dismiss Count VI will be granted.

### D.  Commercial, Trade, or Business Disparagement against Vantage Point, Count VII

"To maintain an actionable claim for commercial disparagement under Pennsylvania law, the plaintiff must allege facts supporting each of the following elements:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 806 (E.D. Pa. 2011) (citing Pro Golf Mfg., Inc. v. Tribune Rev. Newspaper Co., 809 A.2d 243, 246 (Pa. 2002))." Universal Elec. Corp. v. Baldwin, No. 2:17-CV-00842, 2018 WL 3707423, at *15 (W.D. Pa. Aug. 3, 2018). "The defining hallmark of a trade disparagement claim is the requirement that a plaintiff plead pecuniary loss with considerable specificity." Universal Elec. Corp., No. 2:17-CV-00842, 2018 WL 3707423, at *15. "Direct pecuniary loss may be established through allegations demonstrating either a general diminution in sales or specific lost sales." Id. (citation omitted).

Vantage Point argues that CHR fails to plead sufficient factual allegations to state a

claim. Vantage Point contends that CHR "does not offer any details regarding how the alleged false claims were made, when they were made, by whom they were made, and, perhaps, most fundamentally, what exactly was allegedly published." ECF No. 93, at 22. CHR alleges that the disparaging or false claims were made between January 2018 and April 2018, by Vantage Point personnel who authored Vantage Point's audit, which was then published to Armstrong. CHR alleges that Vantage Point's audit was a ruse designed to falsely find fault with CHR's performance under the MSA. CHR further alleges that because of the disparaging statements in the "audit", Armstrong terminated its contract with CHR, which caused CHR's specific pecuniary loss of the benefit of the remaining payment due under the contract. In other words, CHR alleges that it had an established business with Armstrong that provided for payment to CHR under the MSA; Armstrong made some payments under the MSA, but after the audit was published to Armstrong, Armstrong terminated the contract; and as a "natural and probable result" CHR lost the remainder of the amounts due it under the MSA. At this stage of the proceedings, CHR's allegations provide sufficient factual information to raise the reasonable expectation that discovery will reveal evidence of the necessary elements of the cause of action. Accordingly, Vantage Point's Motion to Dismiss Count VII for failure to state a claim upon which relief can be granted will be denied.

### E.    Punitive Damages, Counts IV, V, and VII

Finally, the Third-Party Defendants Gardea and Vantage Point argue that CHR's claim for punitive damages in the Tortious Interference with a Contract claims in Counts IV and V, and in the Business Disparagement claim in Count VII, should be stricken for failure to plead facts to support an award of punitive damages. "Pennsylvania law sets a high and exacting standard for

the award of punitive damages." Allfrey v. Ggnesc E. Stroudsburg LP, No. 3:17-CV-2200, 2018 WL 8494877, at *6 (M.D. Pa. Apr. 9, 2018), report and recommendation adopted sub nom. Allfrey v. Ggnsc E. Stroudsburg LP, No. 3:17-CV-02200, 2018 WL 8493625 (M.D. Pa. Apr. 24, 2018). "'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984) (quoting Restatement (Second) of Torts § 908(2) (1979))). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." Hutchison, 870 A.2d at 770. "[I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." Id. at 772.

The Pennsylvania Supreme Court "has stressed that, when assessing the propriety of the imposition of punitive damages, '[t]he state of mind of the actor is vital." Id. at 770 (quoting Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984)). To prove a claim of Tortious Interference with a Contract requires a showing that the defendant engaged in intentional and improper conduct intending to harm an existing relationship. Here, CHR has alleged that Vantage Point's and Gardea's intentional and improper conduct was done deliberately and outrageously. ECF No. 86, at p. 26, ¶ 68. To prove a Business Disparagement claim requires a showing that the defendant act intentionally by knowingly, or with a reckless disregard for the truth, publishing false statements. Here, CHR alleges that Vantage Point either knew of the falsity of the

18

statements, or acted with a reckless disregard of the truth or falsity of the statements. ECF No. 86, at p. 28, ¶ 85. To determine if the defendants' conduct was sufficiently deliberate or outrageous, or done knowingly or recklessly, to permit a factfinder to consider punitive damages, requires inquiry as to the defendants' state of mind. Hutchison, 870 A.2d at 771. CHR will be required to satisfy Pennsylvania's exacting burden of proof to establish its punitive damages claims, but at this stage of the litigation, CHR has alleged sufficient facts to permit the punitive damages to proceed. Accordingly, Third-Party Defendants' motion to strike CHR's claims for punitive damages is denied.

## IV.  CONCLUSION

For the foregoing reasons the Motion to Dismiss will be granted in part and denied in part, as follows:

1) The Motion to Dismiss will be granted as regards Count III - Breach of Contract against Gardea. Gardea's Motion to Dismiss for lack of venue will be granted. In addition, the Motion to Dismiss as regards the claim for attorney's fees at Count III will be granted. Count III of the Amended Third-Party Claims will be dismissed. The claim for attorney's fees at Count III will also be dismissed.

2) The Motion to Dismiss will be denied as regards Counts IV and V - Tortious Interference with a Contract claims against Gardea and Vantage Point (Count IV) and against Armstrong and Vantage Point (Count V). The Motion to Dismiss the claims for punitive damages in Counts IV and V will be denied.

3) The Motion to Dismiss will be granted as regards Count VI - Civil Conspiracy against

Gardea, Vantage Point, and Armstrong.   Count VI will be dismissed.

4)  The Motion to Dismiss will be denied as regards Count VII - Commercial, Trade, or Business Disparagement claim against Vantage Point.  The Motion to Dismiss the claim for punitive damages in Count VII will be denied.

An appropriate Order will be entered.


BY THE COURT:

Dated: _August 7, 2019_

_Marilyn J. Horan_
Marilyn J. Horan
United States District Court Judge